**Donald WARE, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A04–0602–CR–76.**

Court of Appeals of Indiana.

Jan. 9, 2007.

Ann M. Sutton, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Scott L. Barnhart, Deputy Attorney General Indianapolis, IN, Attorney for Appellee.

## OPINION

ROBB, Judge.

*Case Summary and Issues*

Donald Ware appeals following a jury trial in which he was found guilty of mur-

der, a felony, battery, a Class C felony, and two counts of criminal recklessness, Class D felonies. The trial court sentenced Ware to an aggregate sentence of seventy years. Ware now appeals his convictions and sentence, raising four issues, which we restate as:

1. Whether the trial court properly admitted evidence obtained through a search performed pursuant to a search warrant and statements made following a warrantless arrest;

2. Whether the trial court properly admitted evidence that the State did not disclose to Ware prior to trial;

3. Whether sufficient evidence exists to support Ware's convictions; and

4. Whether Ware's sentence is inappropriate in light of the nature of the offense and his character.

We conclude that the trial court properly admitted the evidence obtained pursuant to the search and arrest, and the evidence that the State did not disclose prior to trial. We further conclude that sufficient evidence exists to support Ware's convictions. Finally, we conclude that Ware's sentence is not inappropriate in light of his character and the nature of the offense. We affirm.[1]

*Facts and Procedural History*

On July 24, 2005, a group of teenage boys gathered in an area near the intersection of Rockville Road and Girls School Road in Marion County for the purpose of throwing eggs at passing cars. At one point, the boys struck Lisa Baker's car. Baker stopped and began yelling that she was going to call the police. The boys then struck a pickup truck, which was later determined to be driven by Ware. Ware stopped, exited his truck, and yelled at the boys. He then returned to his truck and drove to where Baker had stopped her car. While talking to Baker, Ware made racially derogatory comments about the boys and told Baker that he had a rifle and was going to get the boys.[2] Ware asked Baker where the boys were, and after Baker pointed in the general direction, Ware drove after the boys. While the boys were running from Ware's truck, two shots were fired, killing Brandon Dunson and wounding Michael Dyer.

Tracy Nash was the first police officer to arrive on the scene. Officer Nash was unaware that there had been a shooting, and was on the scene to investigate reports of boys throwing eggs at passing vehicles. He noticed Ware's truck because it was traveling at a high rate of speed and saw it pull into a public storage facility's parking lot. When Officer Nash pulled in behind the truck, Ware exited his truck and approached the driver's side of Officer Nash's vehicle. Ware told Officer Nash that he had been struck in the head by an egg, and told Officer Nash that the boys who had thrown the eggs were running behind the public storage facility. Officer Nash told Ware not to leave, and went to look for the boys. When Officer Nash returned to the parking lot after an unsuccessful search for the boys, Ware had left the scene.

Dunson's friends who were running with him were afraid of being caught and did not stop when Dunson was shot. Later that night, one of Dunson's friends who had not participated in the egging became concerned about Dunson and went to look

---

1. We heard oral argument in this case on November 28, 2006, at DePauw University in Greencastle, Indiana. We thank counsel for their advocacy and extend our appreciation to DePauw for hosting the oral argument.

2. Baker testified that Ware told her "that's okay, I'm going to get the nigger mother fuckers because I got a rifle." Transcript at 307.

for him. He found Dunson's body in the grass near the public storage facility and called the police. After learning that a shooting had occurred, the police turned their attention to identifying the man with whom Baker and Officer Nash spoke. Baker was shown a photographic array and initially identified, with ninety percent confidence, Chester Williams as the man with whom she spoke. After being shown a second photographic array, Baker identified Williams with one hundred percent confidence. However, further investigation ruled out Williams as a suspect. A few days later, the police received an anonymous phone call indicating that a man named "Donny" was responsible for shooting Dunson, and that he lived in Avon, Indiana, and drove a red pickup truck. Police then began surveillance of Ware's house and determined that Ware was "Donny." Officers then showed a photographic array to Officer Nash, who identified Ware as the man with whom he spoke the night of the shooting. The police then applied for a warrant to search Ware's house and vehicle. The facts set out in the probable cause affidavit accompanying the warrant application are:

(1) The boys identified the shooter as a white male who was driving a red pickup truck;

(2) Baker spoke with a white male operating a red pickup truck and talking on a cellular phone who told her that he had a gun and was going to pursue the boys;

(3) Officer Nash spoke with a white male operating a red Ford F 150 pickup truck who pointed him in the direction of the boys and left the scene before Officer Nash returned;

(4) Officer Scheid received an anonymous call indicating that the white male who shot Dunson is named "Donny," lives in Avon, Indiana, and drives a red pickup truck with a toolbox in the bed. The caller stated that Donny told her on the night of the shooting that he had shot at someone who had egged him. The caller further stated that Donny sells drugs and had remained in his home since the day of the shooting. The caller finally provided Donny's cell phone number;

(5) Officer Boomershine undertook surveillance of the home identified by the anonymous caller and observed a red Ford F 150 pickup with a toolbox in the bed and a white male who appeared to be approximately 5'10" and 200 pounds;

(6) The license plate on the pickup truck indicated that the truck was registered to Terri Eberwein;

(7) Ware's arrest record indicated that when he had been arrested for possession of cocaine, operating while intoxicated, and resisting arrest, he had been driving a red pickup truck with the same VIN as the truck registered to Eberwein;

(8) The cell phone records for the number supplied by the anonymous caller indicated that Eberwein was the subscriber;

(9) Officers learned from a "Justis Bail Interview" that Ware had previously lived with Eberwein;

(10) Officer Nash picked Ware's photograph out of an array, identifying him as the man with whom he spoke at the scene of the shooting.

After receiving the search warrant, officers found eggshells and residue in and on Ware's truck, and found roughly forty-nine grams of marijuana in Ware's residence. No gun was recovered during this search or throughout the remainder of the investigation. Officers took Eberwein, who was at the residence at the time of the search,

to the police station for questioning. Eberwein told officers that upon returning home the night of the shooting, Ware had told her he had been egged and had "said something about, you know shooting but he didn't say at what or anything," and that he said "he fired some rounds or some shots." State's Exhibit 113. The next day, officers arrested Ware without a warrant and took him in for questioning. Ware admitted being on the scene that night and speaking to Baker and Officer Nash, but denied shooting at the boys or having a gun.

Prior to trial, Ware filed a motion to suppress the evidence obtained as a result of the search and arrest, arguing that probable cause supported neither. After a hearing, the trial court denied Ware's motion. At trial, the boys who had participated in the egging testified. All the boys testified that they saw a red or dark-colored pickup truck chasing them. Three of the boys testified that at some point while they were leaving the scene they saw a truck driving around in the area with someone standing in the truck's bed. The jury also heard the testimony of Officer Nash and Baker,[3] who both identified Ware as the person with whom they spoke that night. Eberwein also testified, and admitted telling officers that Ware had mentioned shooting a gun the night of the incident, but said that when she gave her statement to police, she had been intimidated, was under the influence of prescription and illegal drugs, and had falsified some information in her statement. The jury found Ware guilty of murder, battery, and two counts of criminal recklessness.

Ware filed a motion for the trial court to enter alternative final judgment and a motion for a new trial. The trial court denied

both motions at the beginning of the sentencing hearing. The trial court sentenced Ware to sixty years for murder, six years for battery, and two years for each of the criminal recklessness counts. The trial court then ordered that all sentences be served consecutively based on the number of victims, for an aggregate sentence of seventy years. Ware now appeals his convictions and sentence.

### Discussion and Decision

#### I. Evidence Obtained Pursuant to the Search and Arrest

Ware argues that probable cause did not support the search of Ware's residence and vehicle or his arrest and that therefore the evidence resulting from the search and arrest was erroneously admitted. Specifically, Ware argues that police failed to disclose in the probable cause affidavit that Baker had made a previous identification of Williams as the man with whom she spoke, and that "the crux of the warrant application comes from an anonymous tip." Appellant's Brief at 12.

#### A. Standard of Review

 This case comes to us following a bench trial and conviction, not as an interlocutory appeal from the trial court's denial of Ware's motion to suppress. Therefore, the issue on appeal is whether the trial court erred in admitting the evidence obtained during the allegedly illegal search. *See Washington v. State*, 784 N.E.2d 584, 586–87 (Ind.Ct.App.2003). We will reverse the trial court's ruling only when it has abused its discretion in admitting the evidence. *Id.* at 587. A trial court abuses its discretion if its decision is clearly contrary to the facts and circumstances before it. *Id.*

---

3. Baker testified that after seeing a photograph of Ware, she immediately knew that he was the man with whom she had spoken and

that her original identification of Williams was inaccurate.

### 1. Evidence Obtained Pursuant to the Search Warrant

 In deciding whether to issue a search warrant, the magistrate should " 'make a practical, common sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Query v. State,* 745 N.E.2d 769, 771 (Ind.2001) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). On appeal, we must determine whether a substantial basis existed from which the magistrate could conclude that probable cause existed. *Id.* We give a magistrate's conclusion "significant deference" and uphold such a conclusion if reasonable inferences drawn from the evidence before the magistrate at the time the warrant was granted support the determination of probable cause. *Id.*

### a. Anonymous Informant

The United States Supreme Court has held that uncorroborated hearsay from a source of unknown credibility, standing alone, is insufficient to support a finding of probable cause and issuance of a search warrant. *Gates,* 462 U.S. at 227, 103 S.Ct. 2317. Similarly, Indiana Code section 35–33–5–2(b) requires that probable cause affidavits based on hearsay either:

(1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or

(2) contain information that establishes that the totality of the circumstances corroborates the informant's statements.

 Independent police investigation corroborating an anonymous informant's statements will establish the trustworthiness ·of the hearsay for the purposes of establishing probable cause.[4] *State v. Spillers,* 847 N.E.2d 949, 954 (Ind.2006). However, "[t]he confirmation of 'easily obtained facts and conditions existing at the time of the tip' is insufficient to establish an informant's credibility." *Newby v. State,* 701 N.E.2d 593, 601 (Ind.Ct.App. 1998) (quoting *Gates,* 462 U.S. at 245, 103 S.Ct. 2317). Indiana courts have found that confirming merely that a suspect lives in the residence and drives the vehicle identified by the informant is not adequate to establish the informant's credibility and therefore such confirmation does not support a finding of probable cause. *State v. Mason,* 829 N.E.2d 1010, 1018 (Ind.Ct. App.2005); *see also Jaggers,* 687 N.E.2d at 184 (police investigation confirming facts about the location of suspect's house and two marijuana patches located apart from the suspect's residence failed to satisfy subsection (b)(2) because the totality of the circumstances did not corroborate the informant's hearsay); *Newby,* 701 N.E.2d at 601 ("facts describing [the defendant's] residence were easily observable and within the public domain" and failed to establish the informant's credibility).

In *Mason,* an anonymous informant told police that the defendant was involved in illicit activity with underage girls. The police verified that the defendant's address and vehicle conformed to the informant's information. The police also observed the defendant leave his residence with a teen-

---

**4.** The trustworthiness of hearsay for purposes of proving probable cause can also be established where "the informant has given correct information in the past; ... some basis for the informant's knowledge is shown; or ... the informant predicts conduct or activities by the suspect that are not ordinarily easily predicted." *Jaggers v. State,* 687 N.E.2d 180, 182 (Ind.1997). "Depending on the facts, other considerations may come into play." *Id.*

age girl and drive her home. We found that this information did not support a finding of probable cause because the information confirmed by the police was "easily observable to anyone who knew where the defendant lived and could describe the type of vehicle he drove," and the fact that the defendant drove a girl home did not confirm that he was engaged in any sort of criminal activity. *Mason,* 829 N.E.2d at 1018.

■ Here, much of the information confirmed by the police regarding Ware's identity—the surveillance of his residence establishing Ware's identity, that he is a white male who operates a red pickup truck, and the information gained through the cell phone records—is the type of corroborating information we have found to be insufficient. *See Jaggers,* 687 N.E.2d at 184; *Mason,* 829 N.E.2d at 1018; and *Newby,* 701 N.E.2d at 601. However, the tipster in this case also indicated that "Donny" had told her he had been egged in the face; police knew that the man whom they were looking for had been egged that night. The tipster also knew Ware's cell phone number, something readily available to someone who knew Ware, but not as readily available to the general public. Therefore, the information contained in this anonymous tip may be slightly more specific than the information contained in the tips in *Jaggers, Mason,* and *Newby.* However, we need not decide whether the anonymous tip, standing alone, provided enough evidence to constitute probable cause, because the tip was but one of many facts in the probable cause affidavit.

Most significantly, the probable cause affidavit also indicated that: (1) Baker talked to a white male in a red pickup truck who "stated to her that he had a gun and was going to pursue the juvenile males"; and (2) Officer Nash had identi-

fied Ware as the person driving the red pickup truck at the scene of the shooting. Defendant's Exhibit A. Baker's statement and Officer Nash's identification of Ware constitute sufficient evidence to support the magistrate's determination that there is a fair probability that evidence of a crime would be found at Ware's house and in his vehicle. *See Clark v. State,* 808 N.E.2d 1183, 1193 (Ind.2004) (probable cause existed when arresting officer knew of witnesses' statements putting suspect at scene of crime and indicating that suspect had argued with victim). Baker's statement and Officer Nash's identification were also part of the totality of the circumstances that may be considered sufficient to establish the reliability of the anonymous informant's statement. Ind.Code § 35–33–5–2(b)(2). We conclude that the information contained in the affidavit, as a whole, corroborates the anonymous informant's statement and provides sufficient evidence to support the magistrate's probable cause determination.

#### b. Omission of Baker's Original Identification

Ware also argues that the warrant is deficient because the probable cause affidavit fails to indicate that Baker originally identified someone other than Ware as the man with whom she spoke. Although significant Indiana case law discusses the analysis of an affidavit alleged to contain false information, Ware does not argue that any information contained in the affidavit is actually false, and instead argues that by "[e]xcluding this evidence, the probable cause affidavit changes the focus of the investigation and information they received that suggested someone other than Ware." Appellant's Br. at 14. Ware does not develop this argument, and cites to no authority explaining why this change in focus would invalidate the warrant. The State responds to Ware's argument by

contending that if the information relating to Baker's original identification should have been included in the affidavit, the solution is to ignore the portion of the affidavit dealing with Baker and determine if probable cause still exists.[5] The State apparently comes to this conclusion based on the rule established by *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), which held that when a warrant is supported in part by perjured statements or statements made with a reckless disregard of the truth, the warrant will be invalid if the remainder of the supporting affidavit does not contain sufficient basis for probable cause. *See Jones v. State*, 783 N.E.2d 1132, 1136 (Ind. 2003). However, none of the information in the affidavit dealing with Baker's eye-witness account is false, and neither Ware nor the State has provided any authority, and research has disclosed no authority, suggesting the procedure to determine the validity of a warrant when the State omits information from an affidavit is to remove additional truthful information. However, significant federal case law addresses situations in which the police omit material information that may have affected the magistrate's probable cause determination.

■■■ In addressing a situation where the police learned new information after receiving a warrant, but before executing the warrant, our supreme court held that "[a] magistrate must be made aware of any 'material' new or correcting information." *Query*, 745 N.E.2d at 772 (citing *United States v. Marin–Buitrago*, 734 F.2d 889, 894 (2nd Cir.1984)). The second circuit opinion relied upon by our supreme court in *Query* cited numerous federal cases dealing with the omission of material information from the original affidavit, and

stated that the analysis is the same when dealing with a situation where new information is discovered after a warrant is granted but before it is executed. *Marin–Buitrago*, 734 F.2d at 895 n. 7. Based on our supreme court's reliance on *Marin–Buitrago*, we hold that the analysis of a search warrant application omitting allegedly material information is the same under Indiana law as under federal law. Therefore, a probable cause affidavit must include all material facts, which are those facts that "cast doubt on the existence of probable cause." *Query*, 745 N.E.2d at 772. When the State has failed to include a material term in its application, we will determine the validity of the warrant by considering the omitted information and the information contained in the affidavit together. *See id.*

■■■ When the State omits information from a probable cause affidavit, in order for the warrant to be invalid, the defendant must show: "(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, ... and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause." *United States v. Lakoskey*, 462 F.3d 965, 978 (8th Cir.2006); *see also United States v. Trujillo*, 376 F.3d 593, 603 (6th Cir.2004); *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir.2003); *United States v. Stewart*, 337 F.3d 103, 105 (1st Cir.2003). Therefore, according to the federal courts, whose analysis and rule we hereby adopt, Ware must show: (1) the police failed to include Baker's original identification with the intent to make, or in reckless disregard of whether they thereby would make the affi-

---

**5.** Ware argued at the suppression hearing that the trial court should determine whether the affidavit, without the paragraph dealing

with Baker, contains a sufficient basis for probable cause.

davit misleading; and (2) if the affidavit disclosed Baker's original identification, the affidavit would not have been sufficient to support a finding of probable cause.

■ At the suppression hearing, Officer Boomershine, who prepared the probable cause affidavit, indicated that at the time he prepared the affidavit he was aware that Baker had originally identified Williams as the man with whom she spoke. He also testified that at the time he completed the affidavit he was aware that: (1) detectives had been concerned over potential irregularities in the procedure through which Baker identified Williams; (2) Williams' truck had been examined by the crime lab and no evidence of egg or egg shells had been discovered; (3) Officer Nash had been shown a photographic array including a picture of Williams and had indicated that the man with whom he spoke was not in the array; (4) Officer Nash had viewed Williams in person and had indicated that Williams was not the man with whom he spoke; (5) guns that had been possessed by Williams' parents had been tested and returned after testing had indicated that they were not linked to the shooting; and (6) the Sheriff's department had excluded Williams as a suspect. He further testified that the description given by Baker was consistent with both Williams and Ware. Ware has failed to demonstrate that Officer Boomershine omitted Baker's identification of Williams from the probable cause affidavit with the intent to, or with reckless disregard of whether the omission would, make the affidavit misleading. Therefore, Ware has failed to satisfy the first prong.

Although Ware's failure to satisfy the first prong is fatal to his claim, as Indiana courts have apparently not yet directly dealt with this issue, we will also address the second prong. In order for Ware to satisfy the second prong, Ware must demonstrate that if Officer Boomershine had included Baker's original identification in the probable cause affidavit, it would have contained an insufficient basis for the magistrate to have found probable cause. Neither party has developed an argument as to whether or not this inclusion would destroy probable cause. However, it is reasonable to assume that if Officer Boomershine included Baker's original identification, he would also have included the information relating to Williams. Therefore, the magistrate would not only have learned that Baker had previously identified an individual other than Ware, but also would have learned that Officer Nash had explicitly stated that this individual was not the person with whom he spoke, and that police investigation had ruled out Williams as a suspect. The magistrate would still have had before him Officer Nash's positive identification of Ware, the information contained in the anonymous tip and evidence of the police investigation confirming parts of the tip, and Baker's statement indicating that a white man driving a red truck told her that he had a gun and was going after the boys. We conclude that even if the State had included information relating to Baker's original identification, along with information relating to the events that ruled out Williams as a suspect, the affidavit would still put forth probable cause that evidence of a crime would be found at Ware's house and in his vehicle. Therefore, Ware has also failed to satisfy the second prong.

In so holding, we recognize that what will affect a finding of probable cause will vary from case to case and that our holding here is based on the totality of the circumstances. We acknowledge that it is not practical for police to include every piece of information relating to an investigation in a probable cause affidavit. However, we by no means encourage police to

leave out any information that casts doubt upon the existence of probable cause and emphasize that the best course for police to follow is to include any information that could conceivably affect a probable cause determination.

Because Ware has neither demonstrated that the State excluded material information from the probable cause affidavit, intentionally or recklessly making the affidavit misleading, nor that had the information been included, the affidavit would have not put forth probable cause, we cannot say that the search warrant was invalid. Therefore, the trial court properly admitted evidence obtained pursuant to the search warrant.

### 2. Evidence Obtained Pursuant to Warrantless Arrest

Ware next argues that the police did not have probable cause to arrest him after the search of his residence.

 "Probable cause adequate to support a warrantless arrest exists when, at the time of the arrest, the officer has knowledge of facts and circumstances that would warrant a person of reasonable caution to believe that the suspect committed a [felony]." *Griffith v. State,* 788 N.E.2d 835, 840 (Ind.2003); *see* Ind.Code § 35–33–1–1(a)(2). "The amount of evidence necessary to meet the probable cause requirement for a warrantless arrest is determined on a case-by-case basis, and is less than the level of proof necessary to establish guilt beyond a reasonable doubt." *Ross v. State,* 844 N.E.2d 537, 542 (Ind.Ct. App.2006). Whether or not probable cause existed to support the arrest is a mixed question of law and fact. *Moffitt v. State,* 817 N.E.2d 239, 246 (Ind.Ct.App.

2004), *trans. denied.* As in this case, when the facts relating to the existence of probable cause at the time of the warrantless arrest are undisputed, probable cause is a question of law. *Id.* Therefore, despite our general rule of reviewing a trial court's decision to admit evidence for abuse of discretion, we will review the question of whether Ware's warrantless arrest was supported by probable cause de novo. *Id.* In addressing this issue, we recognize that the amount of evidence necessary for probable cause "is grounded in notions of common sense, not mathematical precision." *Clark v. State,* 808 N.E.2d 1183, 1192–93 (Ind.2004).

In *Clark,* our supreme court found that officers had probable cause to arrest the defendant where officers had evidence that the defendant was at the scene of the crime, had argued with the victim, and had been outside the house when a witness heard the firing of the gun that killed the victim. *Id.* at 1192–93.

 In this case, at the time officers arrested Ware, they had the following evidence: (1) the anonymous tip indicating that "Donny" was the shooter and the information leading police to determine that Ware was "Donny"; (2) Officer Nash's identification of Ware as the man on the scene; (3) Baker's description of the man and vehicle and statement that the man with whom she spoke had a gun and was going to "get" the boys; (4) the presence of egg residue in and on Ware's truck; (5) Eberwein's statement indicating that Ware had come home the night of the shooting and told her he had been egged and had fired off some rounds; (6) an amount of marijuana in Ware's home sufficient to constitute felony possession.[6]

---

**6.** Officers found forty-nine grams of marijuana in Ware's home. Possession of marijuana is a felony if the amount involved is over thirty grams. Ind.Code § 35–48–4–11. Ware was originally charged with possession of marijuana as a Class D felony, but the charge was dropped in the amended information.

We conclude that officers of reasonable caution with knowledge of these facts would believe that Ware had committed a felony. As in *Clark,* the police had evidence that Ware had been at the scene of the crime and was angry with the victim. Ware, in fact had stated that he had a gun and was going to "get" the boys. Besides the evidence linking Ware to the shooting, during the search of Ware's residence, the officers had discovered an amount of marijuana sufficient to charge Ware with a felony.[7] The evidence possessed by police clearly gave the officers probable cause to arrest Ware without a warrant.

## II. Admission of Evidence After Discovery Violation

During the testimony of James Peterson, another boy involved in the incident, Ware admitted a picture that was taken on the night of the shooting of Dunson wearing a white tank top. Peterson testified that, as far as he knew, Dunson had worn the shirt all night. The prosecutor then indicated, in a sidebar conference, that he knew the shirt had been in Dunson's pocket when he was shot, and that the Coroner's office had returned the shirt to Dunson's family, along with the rest of the items found in his pockets. The State later admitted the shirt, over Ware's objection, to show that Dunson had not been wearing the shirt when he was shot, thereby dispelling any claim that Dunson's body had been tampered with after he had been shot. The Deputy Coroner testified that the shirt was in Dunson's pocket when she arrived on the scene, and that she had released the contents of Dunson's pockets to his family because she was unaware of any holds on the property. No record of the shirt appeared in any documents provided to Ware through discovery. Although on appeal Ware claims that the shirt was improperly admitted because of a discovery violation, it does not appear that Ware ever argued at trial that the shirt should not be admitted because the State violated discovery rules. Instead, Ware's objections primarily focused on the lack of foundation.

### A. Standard of Review

 "The trial court has broad discretion in dealing with discovery violations and may be reversed only for an abuse of that discretion involving clear error and resulting prejudice." *Berry v. State,* 715 N.E.2d 864, 866 (Ind.1999). In the context of discovery violations, a continuance is the usual remedy; "[e]xclusion of the evidence is an extreme remedy and is to be used only if the State's actions were deliberate and the conduct prevented a fair trial." *Id.* "Failure to request a continuance, where a continuance may be an appropriate remedy, constitutes a waiver of any alleged error pertaining to noncompliance with the trial court's discovery order." *Fleming v. State,* 833 N.E.2d 84, 91 (Ind. Ct.App.2005) (citing *Warren v. State,* 725 N.E.2d 828, 832 (Ind.2000)).

### B. Admission of a Victim's Shirt

Although the State does not make the argument, the record does not indicate that Ware ever requested a continuance, and therefore may be found to have waived any error relating to the State's failure to disclose the shirt. *Id.* Ware also does not directly address waiver, but does argue that "[a] continuance after three days of testimony was not the proper request." Appellant's Br. at 24. If a continuance would have cured any harm that

---

**7.** The fact that the officers were not primarily interested in arresting Ware because of the possession of marijuana charge is irrelevant to the validity of an arrest based on that charge. *See Brown v. State,* 442 N.E.2d 1109 (Ind.1982) (fact that defendant was a suspect in a rape case did not affect validity of otherwise proper arrest for underage drinking).

arose by any discovery violation, Ware's failure to request one resulted in waiver. *Fleming*, 833 N.E.2d at 91; *see Beauchamp v. State*, 788 N.E.2d 881, 894 (Ind. Ct.App.2003) (continuance would not have cured harm when, after defendant had presented defense, State's witness gave surprise testimony that "substantially impeded the likelihood of proceeding with that defense"). However, as we conclude that Ware was not prejudiced by the admission of the shirt, we will assume, without deciding, that for purposes of this appeal Ware has not waived the issue.

▮ In order to reverse based on the admission of the shirt, we must find that: (1) the State violated a discovery rule; (2) the State did so deliberately; and (3) this violation prejudiced Ware's right to a fair trial. *See Beauchamp*, 788 N.E.2d at 892, 893.

Ware neither explains how the State violated discovery rules nor cites a rule that the State violated. Apparently, Ware is arguing that the State violated Rules of Organization and Procedure of the Marion Superior Court, Rule 7(2)(a)(5), which states: "The State shall disclose ... [a]ny ... tangible objects that the prosecuting attorney intends to use in the hearing or trial. ..." The State argues that it had not intended to introduce the shirt and that it did not become an issue until Ware introduced the picture of Dunson wearing the shirt and elicited testimony from Peterson that Dunson had been wearing the shirt all night. Appellee's Br. at 17.

▮ The plain language of the discovery rule that Ware apparently claims the State violated indicates that the State must disclose evidence it *intends* to use at

trial. Ware does not claim, and has presented no evidence, that the State had any intention of using the shirt at trial until Ware introduced the picture into evidence. After Ware admitted the picture of Dunson wearing the shirt into evidence, the prosecutor stated that the issue of the shirt "was never foreseen" and asked if he could call Dunson's mother, who was in possession of the shirt, as a rebuttal witness. Tr. at 549. Further evidence that the State had not previously foreseen the need to introduce the shirt is the deputy coroner's testimony that she was not aware of any hold on Dunson's property when she released it to the family. Because the evidence indicates that the State did not intend to introduce the shirt at trial, it had no duty to disclose the shirt to Ware, and did not violate discovery rules.[8]

▮ Even if the State did violate some discovery rule by not disclosing the shirt, Ware must show that the State's violation was deliberate. *Berry*, 715 N.E.2d at 866. Whether the State is responding to surprise evidence at trial is relevant to this determination. *Fields v. State*, 679 N.E.2d 1315, 1319 (Ind.1997) (holding that the trial court did not abuse its discretion in allowing an undisclosed witness to testify where trial court found that another witness's "testimony surprised the State and made it necessary for the State to call [the undisclosed witness]"). Ware does not cite any explicit evidence indicating that the State deliberately failed to identify the shirt, but argues that "[c]ertainly when the pathologist testified that he had no shirt to examine for powder burns the State knew this was an issue," and that "[t]he State's ability to produce what it claims is the same

---

8. We also note that "[a]lthough each side has a right to full discovery under this Rule, each side has a corresponding duty to seek out the discovery. Failure to do so may result in the waiver of this right." Rules of Org. & Pro. of the Marion Sup.Ct. 7(1)(d). No evidence indicates that Ware ever asked the State about the shirt or sought disclosure of any records relating to the shirt before trial.

shirt is a little too convenient." Appellant's Br. at 23. The State admits "the contents of [Dunson's] pockets probably should have been noted in the [coroner's] report or kept in the State's possession," but claims that it did not deliberately keep the information regarding the shirt from Ware. Appellee's Br. at 18. We conclude that the evidence indicates that the State's failure to disclose the shirt was not a deliberate attempt to harm Ware. Instead, the evidence indicates that the State had no reason to know that the shirt would be an issue at trial, and its failure to disclose the shirt was at most negligent.

■ Even if the State had deliberately violated a discovery rule, Ware must show that this violation prejudiced his right to a fair trial. *Berry*, 715 N.E.2d at 866. Ware argues that his right to a fair trial was prejudiced because, had Dunson actually been wearing the shirt when he was shot, a pathologist could have determined how far the shooter was from Dunson, and "the range of the shot is important to show whether the shooter was firing from a distance and perhaps without much aim, or a close shot, that would indicate the intent to hit the target." Appellant's Reply Brief at 2. Ware goes on to argue that "[w]ith the question coming down to voluntary manslaughter or murder, the ability to recreate part of the scene indicating proximity between the shooter and the victim was much more than a passing issue." *Id.* However, because Dunson was not actually wearing the shirt when he was shot, the disclosure of the shirt by the State would not have aided Ware in any attempt to recreate the scene, and would not have assisted him with any other apparent line of defense.

Ware also seems to argue that the admission of the shirt prejudiced him because he was unable to investigate its authenticity and because its admission forced him to "change[ ] part of the defense midstream." Appellant's Br. at 24. In *Beauchamp*, the defendant was charged with battery resulting in serious bodily injury in the death of a one-year-old. The defendant's theory of defense was that he had tripped over a chair with the child in his hands, and the child had died as a combination of the injuries resulting from a previous accident and the fall. Beauchamp introduced the deposition of a doctor he had deposed prior to trial who, in part, stated that he had not formed an opinion as to whether the two injuries were connected. At trial, the State used the doctor as a rebuttal witness, and the doctor gave substantially different opinions, based on information the doctor had learned subsequent to his deposition, and stated that Beauchamp's explanation was incompatible with the child's injuries. We held that Beauchamp was prejudiced and that a continuance would not have helped Beauchamp because "[u]ntil the State had introduced the damaging rebuttal testimony, Beauchamp could continue presenting his defense that [the previous injury] had contributed to the death," and that the undisclosed testimony "substantially impeded the likelihood of proceeding with that defense." *Beauchamp*, 788 N.E.2d at 894.

Here, Ware's principal theory of defense was that he was at the scene, but did not have a gun or fire the shots. With regard to the shirt's role in his defense, the following exchange took place when Ware's counsel explained why she wanted to admit a picture showing Dunson on the night of the shooting:

> Ware's Counsel: I want to move to admit [the picture showing Dunson with the shirt on] because ... his body was found without his shirt on. Nobody knows where it is and that's one of the reasons [the pathologist] said he couldn't determine range of fire.

The Court: Is range of fire an issue?

Ware's Counsel: Could be, but it shows that the body wasn't, someone may have been at the body.

Tr. at 550.

The admission of the shirt did not substantially impede the likelihood that Ware could proceed with his defense that he was not the shooter. Moreover, there is no evidence that Ware was pursuing a defense related to range of fire. Even if Ware planned on pursuing such a defense, because Dunson was not wearing the shirt when he was shot, the introduction of the shirt did not substantially impede that defense. Finally, although Ware's trial counsel's statement implies that Ware may have planned on introducing the picture to show that someone had tampered with Dunson's body, Ware has put forth no argument that he relied on this theory, or that his inability to advance this theory prejudiced his right to a fair trial. Indeed, no evidence indicates that this tampering theory played any significant role in his defense. Therefore, this situation is quite different than that in *Beauchamp*, as the State's failure to disclose the shirt, and its subsequent introduction at trial, did not substantially affect Ware's ability to proceed with his defense. We conclude the introduction of the shirt did not prejudice Ware's right to a fair trial.

### III. Sufficiency of the Evidence

#### A. Standard of Review

■■■ When reviewing a claim of insufficient evidence, we will not reweigh evidence or judge witnesses' credibility. *Grim v. State*, 797 N.E.2d 825, 830 (Ind.Ct. App.2003). We will consider only the evidence favorable to the judgment and the reasonable inferences drawn therefrom. *Id.* We will affirm a conviction if the lower court's finding is supported by substantial evidence of probative value. *Id.* When a defendant is convicted based on circumstantial evidence, we will not reverse if the trier of fact could reasonably infer from the evidence presented that the defendant is guilty beyond a reasonable doubt. *Brown v. State*, 827 N.E.2d 149, 152 (Ind. Ct.App.2005). To affirm, we need not find the circumstantial evidence overcomes "every reasonable hypothesis of innocence." *Id.* Instead, we must be able to say that "an inference may reasonably be drawn from [the circumstantial evidence] to support the verdict." *Id.*

#### B. Sufficiency of the Evidence to Connect Ware to the Crimes

■■■ In claiming that insufficient evidence exists to maintain any of his convictions, Ware points to the facts that no gun was ever recovered from him and that no one saw him shoot at the boys. Ware also argues that the testimony of Baker and Officer Nash, and the timing of the calls on his cell phone record, make it seem unlikely that he had time to have shot at the boys. The State argues that the jury could reasonably infer that Ware was the shooter from the evidence placing Ware at the scene of the shooting, the timing of the events, Ware's statements made to Baker, and the fact that Ware left the scene after Officer Nash told him not to leave. Also, Eberwein's statement to police indicated that on the night of the shooting, Ware told her that he had fired some rounds after being struck by an egg.

The reasonable inferences drawn from the evidence show that Ware was at the scene of the crime, stated his intention to shoot the boys, and later told someone that he had shot at the boys. Without reweighing the evidence or assessing witness credibility, we conclude that the jury could have reasonably inferred from the evidence presented at trial that Ware was the shooter.

## C. Sufficiency of the Evidence to Prove Murder and Battery

A person commits murder if he or she "knowingly or intentionally kills another human being." Ind.Code § 35–42–1–1. Ware argues that the evidence is insufficient to show that Ware knowingly killed Dunson and shot Dyer. "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." *Hawkins v. State*, 748 N.E.2d 362, 363 (Ind.2001) (quoting Ind.Code § 35–41–2–2(b)). Ware argues that the evidence leads a reasonable person to conclude that this was an act committed out of anger and rage and that "given the lighting, the timing, the movement, there was no time for the act to be more than a reaction." Appellant's Br. at 20.

We agree with the State's argument that Ware's intent to kill can be demonstrated by the fact that Ware fired a firearm at a group of fleeing boys. *See Dunlap v. State*, 761 N.E.2d 837, 839 (Ind. 2002) (firing shots in the direction of victim constitutes sufficient evidence to find defendant knowingly killed victim). Also, Baker's testimony that Ware said he was "going to get" the boys, tr. at 307, provides support for a finding that Ware acted intentionally. Substantial evidence of probative value supports the conclusion that Ware knowingly killed Dunson and shot Dyer.

## D. Sufficiency of the Evidence to Prove Criminal Recklessness

A person commits criminal recklessness if he or she "recklessly, knowingly, or intentionally performs: (1) an act that creates a substantial risk of bodily injury to another person." Ind.Code § 35–42–2–2.

Ware concedes that the evidence is sufficient to prove one count of criminal recklessness, but argues that one of the boys, Jude Sayles, was not close enough to Ware or Dunson when the shots were fired to be considered the victim of criminal recklessness. In his brief, Ware states that "in order for Mr. Ware to be convicted of Criminal Recklessness, there should be evidence that Jude Sayles was in the direction of the shooting." Appellant's Br. at 20. Ware argues that Sayles's testimony indicates that Sayles had "left [Dyer and Dunson] behind and was out in front when he heard the sound of a BB gun." Appellant's Br. at 20. However, Sayles actually testified that Dyer was "directly beside" him when he heard the gun shots. Tr. at 99. Sayles's affirmative response to the question "[W]ere you pretty much out in front?" comes immediately after Sayles indicated that he did not know where Dunson or two other boys were when he heard the shots. *Id.* at 99. Sayles then restated that Dyer "was right next to me." *Id.* at 100. Ware also states in his brief, "Dyer testified that Jude was around the corner [of a building] when the shots are fired." Appellant's Br. at 20. However, Dyer actually testified that "Jude [was] up here *getting ready* to go around the corner" when Dyer was shot. Tr. at 507 (emphasis added). We find Ware's characterization of the evidence to be inconsistent with the testimony actually introduced at trial.

We conclude that substantial evidence of probative value supports the jury's finding that by firing at the group of boys, Ware recklessly, knowingly, or intentionally performed an act that created a substantial risk of bodily injury to Sayles.

## IV. Sentencing

### A. Standard of Review

When reviewing a sentence imposed by the trial court, we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappro-

priate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(b). Under this rule, we have authority to "revise sentences when certain broad conditions are satisfied." *Neale v. State*, 826 N.E.2d 635, 639 (Ind. 2005).

### B. Appropriateness of Ware's Sentence

 After conducting a sentencing hearing, the trial court sentenced Ware to sixty years for murder, six years for battery, and two years for each count of criminal recklessness. These sentences are all above the advisory sentence for each crime.[9] Ware argues that his sentence is inappropriate based on the nature of the offense and his character. Specifically, he cites the trial court's statement made during the sentencing hearing that Ware "flew into a rage, chased down the kids, shot two shots at fleeing youngsters, traumatizing one and killing the other." Tr. at 1325. Ware argues that this statement demonstrates that Ware was acting "under the heat of passion." Appellant's Br. at 25. Ware also argues that the fact that he was egged before he fired at the boys should be considered. The State responds that Ware did have an opportunity to reflect between the time he was struck with eggs and the time he fired the shots. The State also argues that Ware's use of racial slurs indicates that this crime was also motivated by race; Ware strongly rejects this claim in his brief, arguing that the trial court did not discuss race in the sentencing statement.

In regard to Ware's character, Ware does not develop an argument, but notes that the judge recognized "there are two Donnie Wares, one who is a good person and the other with a criminal history and drug user." Appellant's Br. at 24. The State points out that Ware has three felony and thirteen misdemeanor convictions, and has had his probation revoked three times.

Ware has an extensive criminal history, and a pattern of not conforming to the conditions imposed by our criminal justice system. Ware's character does not warrant a reduction of his sentence. The nature of the offense also does not warrant reduction of Ware's sentence. Although Ware may not have initiated the encounter, and although we have certainly seen more brutal crimes, the act of firing two times at a group of fleeing boys evidences a total lack of regard for human life. After reviewing the nature of the offenses and Ware's character, we conclude that his sentence is not inappropriate.

### Conclusion

We hold that the trial court did not abuse its discretion in admitting evidence obtained pursuant to the search warrant or Ware's warrantless arrest, as both were supported by probable cause. Second, we hold the trial court did not abuse its discretion in admitting the shirt, as the State neither deliberately violated a discovery order nor prejudiced Ware's right to a fair trial. Third, we hold that sufficient evidence supports all of Ware's convictions. Fourth, we hold that Ware's sentence is not inappropriate given his character and the nature of the offenses.

Affirmed.

BAILEY, J., and CRONE, J., concur.

---

9. The advisory sentence for murder is fifty-five years. Ind.Code § 35–50–2–3. The advisory sentence for battery, a Class C felony, is four years. Ind.Code § 35–50–2–6. The advisory sentence for criminal recklessness, a Class D felony, is one and one-half years. Ind.Code § 35–50–2–7.